

JUL 1 4 2020

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| UNDER SEAL | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No: 3:20 cv 309 |
| | ) | Corker - Poplin |
| UNDER SEAL | ) | **FILED UNDER SEAL** |
| | ) | **DO NOT PLACE IN PRESS BOX** |
| | ) | **DO NOT ENTER ON PACER** |
| Defendants. | ) | |
| | ) | **DEMAND FOR JURY** |

**RELATORS' <u>SEALED</u> *QUI TAM* COMPLAINT PURSUANT TO
THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3730(b)**

1



FILED

JUL 1 4 2020

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. PAULA ARNOLD and | ) | |
| SELENA PARROTT | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No: 3:20 CV 309 |
| v. | ) | Corker-Poplin |
| | ) | **FILED UNDER SEAL** |
| LHC GROUP, INC.; | ) | |
| UNIVERSITY OF TENNESSEE | ) | |
| MEDICAL CENTER | ) | |
| HOME CARE SERVICES, LLC | ) | **DO NOT PLACE IN PRESS BOX** |
| | ) | **DO NOT ENTER ON PACER** |
| Defendants. | ) | |
| | ) | **DEMAND FOR JURY** |

## RELATORS' <u>SEALED</u> *QUI TAM* COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3730(b)

Pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA" or the "False Claims Act"), Relators Paula Arnold and Selena Parrott, on behalf of themselves and the United States of America, allege and claim against LHC Group, Inc. and University of Tennessee Medical Center Home Care Services, LLC as follows:

2

## JURISDICTION AND VENUE

1.    This action arises under the False Claims Act, 31 U.S.C. §§3729-33 (the "False Claims Act").  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1331.  Jurisdiction is also authorized under 31 U.S.C. §3732(a).

2.    Venue lies in this judicial district pursuant to 31 U.S.C. §3732(a), because Defendant qualifies to do business in the State of Tennessee, transacts substantial business in the State of Tennessee, transacts substantial business in this judicial District, and can be found here.  Furthermore, Defendant committed within this judicial District acts proscribed by 31 U.S.C. §3729, to-wit:  Defendant submitted to the United States false claims for payment for home health services that were provided to ineligible, non-homebound, patients submitted in violation of Medicare billing requirements, or medically unnecessary and improper; and made or used false records material to such false claims and knowingly concealed obligations to repay funds to the Medicare program.

## PARTIES

3.    Defendant LHC Group, Inc. ("LHC Group," "LHC" or "Defendant LHC") is a corporation based in Lafayette, Louisiana engaged in the business of providing home health and hospice services.  LHC Group operates roughly 553 home health service locations in 35 states and the District of Columbia.  Nearly all

3

of LHC's home health locations are either wholly-owned by LHC or majority-owned by LHC through equity joint ventures.

4.     Defendant University of Tennessee Medical Center Home Care Services, LLC ("U.T. Home Care") is a subsidiary of LHC Group, Inc.  LHC Group, Inc. directs and oversees the day-to-day operations of U.T. Home Care. U.T. Home Care has its primary office in Knoxville, Tennessee and provides home care throughout 16 counties in East Tennessee with satellite offices in Jefferson City, Newport, Morristown and Sevierville, Tennessee and formerly in Rogersville, Tennessee.  Because LHC Group, Inc. oversees every aspect of and fully controls the operation of U.T. Home Care and the home health services and fraud alleged herein, U.T. Home Care is merely an alter-ego of LHC Group, Inc. Accordingly, LHC Group, Inc. and U.T. Home Care are indistinguishable in its operations and fraud and are referenced herein collectively as "Defendants" or simply as "LHC" or "LHC Group."

5.     Relator Paula Arnold is registered nurse (RN) who was employed by LHC Group, Inc. in its Rogersville and Jefferson City Tennessee agencies from March 2015 to August 2017.

6.     Relator Selena Parrott is a registered nurse (RN) who was employed by LHC as a "PRN" nurse, or an "as needed nurse," working in LHC Group, Inc.'s Newport, Tennessee agency from 2017 to January 2018.

4

7.     Prior to filing this Complaint, Relators voluntarily disclosed to the Government the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3729(e)(4)(A), Relators are the original source of the information for purposes of that Section. Alternatively, Relators have knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relators voluntarily provided that information to the Government before filing this Complaint. Relators are serving contemporaneously herewith a statement of the material evidence in their possession upon which their claims are based.

## APPLICABLE LAW

### I. The False Claims Act

8.     The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who: (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government; (4) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; or (5) conspires to commit a violation of the False Claims Act is

5

liable to the United States for a civil monetary penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104–410 [1]), plus treble damages. 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

9.     Under the FCA, (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud.  31 U.S.C. § 3729(b)(1).

10.    The FCA defines the term "claim" as (A) any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.  31 U.S.C. § 3729(b)(2)

6

11.     The FCA defines the term "obligation" as an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3).

## II.     Medicare Home Health Coverage

12.     The Medicare Program is established under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, and provides health insurance coverage for eligible citizens.  The United States Department of Health and Human Services, specifically the Center for Medicare and Medicaid Services ("CMS"), oversees the administration of Medicare.

13.     CMS administers many aspects of the Medicare program through contracts with third-party Medicare Administrative Contractors (MACs). 42 U.S.C. § 1395kk-1.  Through these contracts, MACs perform the following functions, among others, in the administration of the Medicare program: determination of payment amounts, making payment, and reviewing the activities of medical providers, including medical utilization and fraud review. 42 U.S.C. § 1395kk-1; 42 U.S.C. § 1395ddd.

14.     As part of its coverage, Medicare pays for some "home health services" for qualified patients.  To qualify for home health care reimbursement

7

under Medicare, a patient must be certified by a physician, or non-physician practitioner working in collaboration with the physician, as eligible for Medicare home health services. When a patient so qualifies, Medicare will pay for: (1) part-time skilled nursing care; (2) physical, occupational, or speech therapy; (3) medical social services (counseling); (4) part-time home health aide services; and (5) medical equipment and supplies. 42 U.S.C. §1395x(m).

15. To be eligible for Medicare home health services, the patient must:

(i) Need intermittent skilled nursing services or physical, speech, or occupational therapy;

(ii) Be homebound ("confined to the home") as defined by Medicare;

(iii) Have a plan of care established, which will be periodically reviewed by a physician;

(iv) Be furnished home health services while the patient was or is under the care of a physician; and

(v) Have a "face-to-face" in-person encounter with a physician to ensure that the physician has assessed the patient and can personally certify that the patient meets the eligibility criteria for Medicare home health services.

*See* 42 U.S.C. § 1395(f)(a)(2)(C); 42 C.F.R. § 424.22

8

16. Medicare pays for home health care by way of a Prospective Payment System (PPS). *See* 42 C.F.R. §484. The PPS is based on a "national prospective 60-day episode payment," a rate based on the average cost of care over a 60-day episode for the patient's diagnostic group. Upon a physician's referral, a home health agency (HHA) is required to make an initial assessment visit and perform a comprehensive assessment encompassing the patient's clinical, functional, and service characteristics. Accordingly, a registered nurse must evaluate the patient's eligibility for Medicare home health care, including homebound status, and must determine the patient's care needs using the Outcome and Assessment Set (OASIS) instrument. The OASIS diagnostic items describe the patient's observable medical condition (clinical), physical capabilities (functional), and expected therapeutic needs (service). Based upon the OASIS information -- and in turn upon the expected cost of caring for the patient -- the patient's "case mix assignment" is determined and the patient is assigned to one of eighty Home Health Resource Groups (HHRGs). The patient's HHRG assignment and other OASIS information are represented by a Health Insurance Prospective Payment System (HIPPS) code that is used by Medicare to determine the rate of payment to the HHA for a given patient.

17.     Once the HHA has submitted the patient's OASIS information, partial payment is made based on a presumptive a 60-day episode.[1]  To continue receiving covered care for another 60-day episode, the patient must be re-certified by a physician within the final five days of the initial episode as requiring and qualifying for home health care, and a new comprehensive assessment must be performed by the HHA recording the HHA's independent assessment that the patient is actually homebound and continues to require skilled services.  The initial base rate may be subject to upward adjustment, such as where there is a "significant change in condition resulting in a new case-mix assignment," or downward adjustment, such as where the number of predicted therapy visits substantially exceeds the number actually performed.  Throughout the patient's episode, the HHA is required to maintain clinical notes documenting the patient's condition, homebound status, and the health services performed.

**A. Medicare "Homebound" Requirements**

18.     For a patient to be eligible to receive covered home health services under both Medicare Part A and Part B, a physician must certify in all cases that the patient is confined to his/her home.

---

[1] Beginning on January 1, 2020, CMS provides an initial payment corresponding to the anticipated cost of a 30-day episode. *See* 42 C.F.R. § 484.285

10

19.     It is the responsibility of the HHA to independently assess and verify whether a patient is homebound before it can bill and receive payment for home health services from Medicare.  42 C.F.R. §484.55.

20.     Medicare defines "confined to the home" (homebound) as meeting the following criteria.  First, the patient must either:

> **- Require the aid of supportive devices such as crutches, canes, wheelchairs, and walkers; the use of special transportation; or the assistance of another person in order to leave their place of residence**
>
> **OR**
>
> **- Have a condition such that leaving his or her home is medically contraindicated**

21.     If the patient meets one of the above criteria, then the patient must ALSO meet both additional requirements of:

> **- There must exist a normal inability to leave home;**
>
> **AND**
>
> **- Leaving home must require a considerable and taxing effort.**

Medicare Benefit Policy Manual ("MBPM") Ch. 7, §30.1.1.

22.     Further defining the term "homebound," CMS has issued guidelines recognizing a narrow exception, when a patient must leave the home under extraordinary circumstances allowing an HHA to nevertheless continue to receive federal reimbursement for home health services so long as the patient is otherwise

11

homebound and only: (a) leaves the home infrequently; (b) for a short period of time; or (c) to receive medical treatment that cannot be provided in the home setting. *See* Medicare Benefit Policy Manual ("MBPM") Ch. 7, §30.1.1.

23.     For an HHA to receive payment from Medicare, a beneficiary must actually be homebound, notwithstanding the existence of an otherwise valid certification of homebound status by a physician. *See e.g. U.S., ex rel., Prather v. Brookdale Senior Living Communities, Inc.,* No. 3:12-CV-00764, 2015 WL 1509211, at *4 (M.D. Tenn. Mar. 31, 2015) (in addition to the physician's certification, "[M]edicare also conditions payment on the beneficiary's actually being homebound and actually needing skilled services").

24.     Additionally, it is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50. Medicare providers may not bill the United States for medically unnecessary services or procedures performed solely for the profit of the provider. *Id.*

## B. Skilled Nursing Care and Skilled Therapy Requirements

25.     To be eligible for the Medicare Home Health Benefit, a patient must require skilled nursing services or skilled therapy services. *See* 42 C.F.R. § 424.22.

26.     To be considered a skilled service, the service must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel. *See* Medicare Benefit Policy Manual Ch. 7; §40.1.

27.     Skilled nursing services are covered when an individualized assessment of the patient's clinical condition demonstrates that the specialized judgment, knowledge, and skills of a registered nurse or, in certain instances, a licensed practical nurse are necessary. Accordingly, the services of a home health aide do not qualify as skilled nursing services.[2]

28.     When, however, the individualized assessment does not demonstrate such a necessity for skilled care, including when the services needed do not require skilled nursing care because they could safely and effectively be performed by the patient or unskilled caregivers, such services will not be covered under the Medicare home health benefit.

29.     The Medicare Home Health Benefit also covers Skilled Therapy Services. 42 C.F.R. 424.22.   To be covered as skilled therapy, the services must

---

[2] Home Health Aide Services are covered under the Medicare Home Health Benefit when the services are reasonable and necessary to the treatment of the patient's illness or injury, among other requirements. Covered home health aide services include "personal care" which is defined in part as bathing dressing, caring for hair, nail and oral hygiene needed to facilitate treatment or to prevent deterioration of patient health, feeding, assistance with elimination (including routine catheter care), assistance with ambulation, changing position in bed and assistance with transfers. See Medicare Benefit Policy Manual Ch. 7 § 50.2

13

require the skills of a qualified therapist and must be reasonable and necessary for the treatment of the patient's illness or injury.

30.     Assuming all other eligibility and coverage criteria have been met, the skilled therapy services must be reasonable and necessary to the treatment of the patient's illness or injury within the context of the patient's unique medical condition. To be considered reasonable and necessary for the treatment of the illness or injury:

    a.     The services must be consistent with the nature and severity of the illness or injury, the patient's particular medical needs, including the requirement that the amount, frequency, and duration of the services must be reasonable; and

    b.     The services must be considered, under accepted standards of medical practice, to be specific, safe, and effective treatment for the patient's condition. The home health record must specify the purpose of the skilled service provided.[3]

**C. Medicare Certifications – Which Defendants Falsified**

31.     To enroll as a Medicare provider, Defendants were required to submit a Medicare Enrollment Application for Institutional Providers. *See* CMS Form 855A. In submitting Form 855A, Defendants made the following "Certification Statement" to CMS:

---

[3] Medicare Benefit Policy Manual Chapter 7; §40.2.1.

I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

32.     Defendants then billed and caused the billing of Medicare by submitting a claim form (CMS Form 1450 for Medicare Part A home health claims, or, more commonly, CMS Form 1500 to for home health claims covered under Medicare Part B) to the MAC responsible for administering Medicare home health claims on behalf of the United States. *See* CMS Form 1450; CMS Form 1500. Each time Defendants submitted a claim to the United States through the MAC, Defendants certified that the claim was true, correct, and complete, and that it had complied with all Medicare laws and regulations, including but not limited to those cited above.

33.     Further, each time Defendants submitted certifications that a patient was eligible for the Medicare Home Health Benefit, Defendants certified that the patient met all requirements for eligibility – including that the patient was homebound and needed skilled services. *See* CMS Form 485.

15

## DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

### Defendants Knowingly Billed For Ineligible Patients

34.     Defendants knowingly billed the United States for patients who did not qualify for the Medicare home health benefit because the patients were not homebound as defined by Medicare, or did not require skilled nursing care or therapy, or both, in violation of 42 U.S.C. § 1395f.  Moreover, Defendants knowingly billed the United States for therapy and nursing services that were not reasonable and necessary in violation of 42 U.S.C.§ 1395y, or for services that were never actually provided.

35.     In the East Tennessee offices where Relators were employed, primarily in the Rogersville, TN and Newport, TN agencies, it was well known among staff that certain patients were obviously not homebound or did not require skilled care, or both, but were kept on service regardless.

36.     LHC corporate policies mandated excessive admission goals and excessive census requirements that could not be met absent fraud.  If these excessive quotas were not met, LHC clinicians and managers were threatened with termination.  In this way LHC pressured employees at its U.T. Home Care offices to fraudulently meet the pre-set quotas or lose their employment. These overly-aggressive policies inevitably caused the U.T. Home Care offices to admit and recertify ineligible patients for the Medicare Home Health Benefit.  Accordingly,

16

through their own experience and through conversations with other LHC agencies, Relators allege the practices and fraud occurring in the U.T. Home Care offices in which they worked were perpetrated throughout LHC's nationwide operations.

37. In LHC weekly case conferences—during which staff ostensibly discussed patients' conditions to determine whether the patients were eligible to be recertified for additional home health services—a common topic discussed among LHC clinicians was how they could provide the number of visits projected (and already paid for) by Medicare, when patients were often not home at the time of their pre-scheduled visits. Instead of acknowledging that these patients were not homebound and should be discharged, LHC managers Cheryl Wyatt and Vicki Lewis would suggest strategies for "catching the patient at home" such as regularly driving by the patients' house to see if a car was present or lights on, indicating that the patient might be home and the clinicians could stop by for an impromptu visit.

38. Further, LHC administrator Cheryl Wyatt frequently and openly discussed patients' planned outings and vacations in order to schedule home health visits around the patients' routine, non-medical, out-of-home excursions.

39. If LHC nurses or therapists complained to Ms. Wyatt or other LHC administrators that the patients were not homebound, or did not require skilled nursing care, the ineligible patient would be removed from the complaining

clinician's schedule and re-assigned to a different clinician that Ms. Wyatt believed would be more amenable to helping to perpetrate LHC's fraud.

40.     LHC administrators regularly admonished clinical staff for accurately documenting that LHC patients were not homebound.  For example, Relator Selena Parrott accurately documented that a LHC home health patient attended Tai Chi classes outside of her home at a community center in Mooresburg, TN on a weekly basis.   Instead  of  discharging  this  non-homebound  patient  and  refunding Medicare's  previous  home  health  payments,  LHC  managers  Cheryl  Wyatt  and Vicki  Lewis  scolded  Relator  Parrott  for  truthfully  documenting  the  patient's regular  excursions  from  the  home.  Ms.  Wyatt  informed  Relator  Parrott,  that because Ms. Parrott documented the patient's regular excursions to Tai Chi classes, her  charting  indicated  the  patient  was  not  homebound.   Ms.  Wyatt  further explained that documenting non-homebound status was unacceptable because the patient  was  required  to  be  homebound  and  if  non-homebound  status  was discovered by Medicare or the MAC, home health payments would have to be refunded to Medicare.  In other words, and as represented by this example, it was the practice of LHC management to instruct clinical staff how to both perpetrate and conceal LHC's fraud.

41.     The following patients are representative examples of patients who LHC admitted or recertified and billed to the United States despite Defendants' knowledge that the patients were ineligible for the Medicare Home Health Benefit:

a.  Patient J.N, a patient who Defendants falsely certified in March 2017 as homebound and in need of skilled nursing care.  Patient J.N. was not homebound and did not have a legitimate need for in-home skilled nursing care.  Patient J.N.'s admitting diagnosis to home health was pernicious anemia, yet Relator Arnold personally witnessed that Patient J.N. never exhibited any symptoms of anemia and Patient J.N.'s primary care physician's office had no documentation of a pernicious anemia diagnosis.  Patient J.N. did not require skilled care as the only skilled nursing service provided to Patient J.N. was a routine B12 injection for the treatment of pernicious anemia—which Patient J.N. did not exhibit. Moreover, Patient J.N. was not homebound and routinely left her home, including taking out-of-state trips to the Amish Country of Pennsylvania with her church.   In April 2017, LHC administrator Cheryl Wyatt accompanied Relator Paula Arnold to perform a home health visit with Patient J.N.  During this visit, Patient J.N. discussed with Relator Arnold and Ms. Wyatt an upcoming trip with her church to Pennsylvania. Obviously, then, LHC and Ms. Wyatt had clear knowledge that Patient

19

J.N. was not homebound and should be discharged. Relator Arnold urged Ms. Wyatt to discharge Patient J.N. Instead, Relator believes Patient J.N. was recertified because Ms. Wyatt informed Patient J.N. that this out-of-state excursion was not a problem and LHC "could work around the trip." Due to Relator Arnold's objections and requests to discharge Patient J.N., Patient J.N. was moved to a different nurse's case load.

b. Patient J.D., a patient who Defendants consistently and falsely certified throughout 2016 and 2017 as homebound and in need of skilled nursing care. The only service provided to Patient J.D. was a prothrombin ("pro-time") test—which is not a skilled service. Further, Patient J.D. left his home regularly by driving himself in his own vehicle and was thus not homebound. Patient J.D. would routinely drive to visit family as well as often drive to Wal-Mart and to perform other shopping. Due to his frequent and extended excursions, LHC nurses had to carefully schedule Patient J.D.'s home health visits to try to ensure he would be home at the time of pre-scheduled visits. Nevertheless, LHC repeatedly recertified him and fraudulently billed the United States for skilled care that he did not require.

20

c. Patient K.B., a patient who Defendants falsely certified in the fall of 2016 and in 2017 as homebound and in need of skilled physical therapy. Although, Patient K.B. was not homebound and routinely informed LHC clinicians that he and his wife were planning to leave their home immediately after his home health visit concluded. Specifically, Patient K.B. on several occasions informed LHC clinicians, including Physical Therapy Assistant Sean Jared, that Patient K.B. was planning to travel to Greenville, TN to have lunch with his children. Accordingly, all of Patient K.B.'s home health visits were scheduled for 10 A.M., so he would be able to go out to lunch afterward.

d. Patient P.S., a patient who Defendants consistently and falsely certified throughout 2015 to 2017 as homebound and in need of skilled nursing care. However, Patient P.S. did not have a medical need for skilled nursing care. LHC Licensed Practical Nurse (LPN) Angela Sims informed Patient P.S. that she would be able to receive the Medicare Home Health Benefit "for a long time" if she received vitamin B12 injections. Upon this recommendation, Patient P.S. obtained an order for routine vitamin B12 injections to address her COPD (which is not a Medicare covered diagnosis for vitamin B12 therapy).

e. Patient D.W., a patient who Defendants certified as homebound and in need of skilled nursing care, physical therapy and occupational therapy in the summer and fall of 2016. Relator Arnold was sent to perform the initial evaluation and admission of Patient D.W. Upon initial evaluation, Patient D.W. informed Relator Arnold that he could drive and did drive regularly, performing whatever errands he needed. Further, it was apparent to Relator Arnold that Patient D.W. did not have a skilled need for services because Patient D.W. specifically told Relator Arnold that the only services he wanted and was willing to accept from home health was to have his face shaved. Relator Arnold called LHC supervisor Debbie Smith and informed her that the patient was clearly not homebound and did not have a skilled need. Despite the information that the patient was not eligible for the Medicare Home Health Benefit, Ms. Smith instructed Relator Arnold to admit Patient D.W., stating "let's see what we can do to help the patient."

f. Patient B.M., a patient who Defendants continually certified as homebound and in need of skilled nursing care from 2013 to August 2017. As with many of LHC's ineligible patients, Patient B.M. was admitted to the Medicare Home Health Benefit under a pernicious anemia diagnosis and the only service provided by LHC was a vitamin

22

B12 injection. Moreover, Patient B.M. was known by LHC to not be homebound, yet he was consistently falsely certified as homebound. Relator Arnold personally witnessed Patient B.M. regularly driving; he habitually drove to a local store in Blaine, TN, some 15 miles from his home to shop and socialize. Patient B.M. was also known to routinely miss home health visits because he was not home. Relator Arnold informed LHC Manager Pam Harris of each of these facts and Relator Arnold's obvious conclusion that Patient B.M. was not homebound. Ms. Harris responded by simply stating that "she would look into it," yet Patient B.M. remained on Medicare funded Home Health Care and continued to be falsely certified by LHC as qualifying for the Medicare Home Health Benefit.

g. Patient S.W., a patient insured by the Veterans Administration and Medicare, who LHC falsely certified as homebound and in need of skilled nursing care related to wound care of a diabetic ulcer throughout 2016 and 2017. Relator Selena Parrott witnessed that Patient S.W. was not homebound as he would regularly leave home for non-medical reasons, including regularly traveling from the remote rural area where Patient S.W. lives to Morristown, TN – some 40 miles away. Moreover, Patient S.W. did not require, and LHC did not perform, skilled wound

23

care on Patient S.W. because Patient S.W.'s wife was fully capable of dressing Patient S.W.'s wound and regularly did so. Accordingly, when Relator Parrott would arrive to perform wound care, the care had already been provided and there was nothing for her to do for Patient S.W. Relator Parrott informed LHC management Cheryl Wyatt and Vicki Lewis that Patient S.W. was not homebound and did not need skilled nursing care. However, Ms. Wyatt and Ms. Lewis continued to recertify Patient S.W. as eligible for the Medicare Home Health Benefit, stating LHC should "do the best they can with Patient S.W."

h. Patient P.Q., a patient who Defendants falsely certified as homebound and in need of skilled physical therapy throughout 2016. Patient P.Q. was clearly not homebound as she regularly traveled some three hours away to the Harrah's Casino in Cherokee, North Carolina. LHC managers Debbie Smith and Amy Haynes, RN were specifically informed of Patient P.Q.'s regular casino trips by LHC licensed practical nurse (LPN) Sandra Mauk Gladson, yet LHC continued to falsely re-certify Patient P.Q. as eligible for Medicare funded home care. Further, LHC had knowledge that Patient P.Q. was not homebound because Patient P.Q. routinely was not at home at the time of her pre-scheduled home health visits.

24

i. Patient A.M., a 104-year-old female patient who Defendants falsely certified as in need of skilled nursing care for several separate certification periods, beginning in at least 2016. At this initial home health admission, Defendants intentionally misdiagnosed Patient A.M. with pernicious anemia in an effort to justify providing Patient A.M. with skilled nursing care of administering B12 injections. As detailed herein, a false diagnosis of pernicious anemia was common tactic used by Defendants to attempt to justify skilled nursing care of administering B12 injections. However, in early 2016 Patient A.M.'s physicians at the Rural Health Services Consortium in Rogersville, TN recognized that Patient A.M.'s B12 levels were dangerously high because Defendants had been providing Patient A.M. with unnecessary B12 injections.

## COUNT ONE
## PRESENTING OR CAUSING TO BE PRESENTED
## FALSE CLAIMS IN VIOLATION OF 31 U.S.C. §
## 3729(a)(1)(A)

42. Relators adopt and incorporate the paragraphs 1-41 as though fully set forth herein.

43. Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information –

25

presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

a. Defendants submitted false claims for home healthcare provided to patients whom Defendants knew were not homebound or did not require skilled care and did not meet Medicare or Medicaid requirements for home healthcare, in violation of 42 U.S.C. §1395f;

b. Defendant submitted false claims for home health services premised upon Defendant's false or fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A, 1450, 485 and elsewhere.

44. Relying on Defendants' false representations, the United States paid the false claims described herein and summarized in previous paragraph.

45. Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil

26

penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

**COUNT TWO**
**MAKING OR USING FALSE STATEMENTS OR**
**RECORDS MATERIAL TO A FALSE CLAIM IN**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)**

46.    Relators adopt and incorporate the paragraphs 1-41 as though fully set forth herein.

47.    Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

a.    Defendants made and used false records reflecting purported nursing and therapy visits rendered to patients who did not qualify under the Medicare home health benefit – including, those patients described in paragraph 42 – in violation of 42 U.S.C. § 1395y(a)(1)(A) and the Medicare regulations cited *supra*;

b.    Defendants made and used false assessment data that inaccurately reflected patient conditions and falsely stated that the patients were homebound when they were not;

c. Defendants made and used false assessment data that inaccurately reflected patient conditions and falsely stated that the patients required skilled care, when they did not.

d. Defendants made and used false CMS Forms 1450, 855A, 485 and other false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid when in fact Defendants intended to – and did – defraud the Medicare system by falsely claiming payment for ineligible home health patients, including for the specific patients described in paragraph 42.

48. In reliance upon Defendants' false statements and records, the United States paid false claims submitted by Defendants that it would not have paid if not for those false statements and records. The false records or statements described herein were material to the false claims submitted or caused to be submitted by Defendants to the United States.

49. Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed by the United States for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendants, in an amount equal to treble the

28

damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT THREE
## "REVERSE FALSE CLAIMS" UNDER 3729(a)(1)(G)

50.　Relators adopt and incorporate the paragraphs 1-41 as though fully set forth herein.

51.　By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit: Defendants knew that it had received much needed Medicare dollars in home health PPS payments for patients who did not qualify for the Medicare home health benefit, yet Defendants took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

52.     As a result of Defendants' fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendants.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## DEMAND FOR JURY TRIAL

Relators, on behalf of themselves and the United States of America, demand a jury trial on all claims alleged.


Dated: July 13, 2020              Respectfully Submitted,

                                  _____
                                  JERRY E. MARTIN
                                  Jerry E. Martin (TBR # 020193)
                                  Seth M. Hyatt (TBR # 031171)
                                  **BARRETT JOHNSTON MARTIN &
                                  GARRISON, LLC**
                                  Philips Plaza
                                  414 Union Street, Suite 900
                                  Nashville, TN 37219
                                  Tel. (615) 244-2202
                                  Fax: (615) 252-3798
                                  jmartin@barrettjohnston.com
                                  shyatt@barrettjohnston.com

30

**FROHSIN BARGER & WALTHALL**
James F. Barger Jr.*
Georgia Bar No. 843064
J. Elliott Walthall*
Alabama Bar No: 0967-E58W
Benjamin P. Bucy*
Georgia Bar No: 526064
100 Main Street
Saint Simons Island, Georgia 31522
Tel: (205) 933-4006
jim@frohsinbarger.com
elliott@frohsinbarger.com
ben@frohsinbarger.com

*Motions for admission *pro hac* vice
forthcoming

31

## **Certificate of Service**

On or before the 24th day of July 2020, Relators hereby certify that in compliance with Rule 4 of the Federal Rules of Civil Procedure, service of this *Qui Tam* Complaint will be executed as follows:

**By Certified Mail to:**

United States Attorney's Office for the Eastern District of Tennessee
Attn.: Assistant United States Attorney Robert McConkey
800 Market St. Suite 211
Knoxville, TN 37902

**By Certified Mail to:**

Attorney General of the United States of America
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

_____
JERRY E. MARTIN